BURRELL, Trustee, &c., and STEWART *v*. BULL and others.

A husband cannot be a witness in favor of his wife, or of her trustee, in a suit respecting her separate estate ; although he has no interest in the subject matter.

This was held on the ground that public policy prohibits husband and wife from being witnesses for or against each other in civil cases, and from testifying during or subsequent to the marriage, concerning what transpired between them while the marriage subsisted, or came to their knowledge by reason of the married relation.

Where two or more parties are interested in a lease about expiring, one of them cannot take a new lease in his own name to the exclusion of the others.  And if, after undertaking with the others to procure a renewal, he take it to himself, and attempt to retain it solely, it is a fraud upon his associates.

P. conducted a refectory, owning three-fourths of the lease, fixtures, stock and movables ; and S. owned the other fourth.  B. and M. held mortgages on P.'s interest, which were deemed not quite secure ; arrears of rent were due and a distress made.  B. and M. in the absence of S., agreed with P. to pay the rent in arrear, if he would give them instant possession of the refectory, and that they would protect the interests of S., who was to refund to them one-fourth of the arrears.  They received possession of the whole accordingly, and placed an agent in charge.  S. on his return assented to what had been done.  B. and M. did not pay the arrears, but suffered a sale therefor under the distress, at which they became the purchasers of the fixtures, stock and movables, and continued the business.  The lease had nearly expired, and before the sale it had been arranged that B. should procure a new lease for the common benefit of S., B. and M.  He obtained the renewal in his own name and claimed it as his own ; and soon after he and M., separately, sold their respective interests in the whole concern, to K., and delivered to him possession of the whole, which he maintained, excluding S. In a suit by S. against B., M. and K. ; *Held*, 1. That B. and M. were bound to account to S. for one-fourth of the profits from the time they took possession, till their sale to K., and for one-fourth of the price obtained for the refectory from him, and were entitled to credit for one-fourth of the rents paid by them upon the distress and subsequently.

2. That the new lease obtained by B., enured to the benefit of M. and S.

3. That P. was a competent witness for S., though he was originally to pay the rent as a part of the expenses of the refectory.

4. That K. was also a competent witness for S., his liability being secondary to that of B. and M., and all being liable, *ex delicto*.

5. That the statute of frauds has no application, either to the agreement to pay the arrears of rent, or to the interest which S. claimed in the renewed lease.

April 10, 11, 12, and May 8 ; August 28th, 1845.

THE bill was filed April 29th, 1843, by George P. Burrell as

the trustee of the separate estate of Mrs. Louisa M. Stewart, and Mrs. Stewart by Burrell as her next friend, against Michael K. Burke, Marcus Bull, Henry S. McKean, W. Coventry H. Waddell the general assignee in bankruptcy, and J. Hopkins Stewart, the husband of Mrs. Stewart.

The pleadings and proofs were voluminous; but it is deemed sufficient for understanding the legal propositions involved, to state in brief terms, the material facts as ascertained by the court upon deciding the cause.

Burrell was the trustee of Mrs. Stewart in her marriage settlement, with ample powers of investment and disposal. Mr. Stewart had no interest in the separate estate, either present or contingent.

William Pine, on the 17th of September, 1841, being possessed of a lease from the executors of John T. Irving, of certain premises at the corner of Nassau and Pine streets, which at a considerable outlay for fixtures, furniture, &c., he had fitted up for a refectory on an extensive scale; sold and conveyed to Burrell as trustee, an undivided fourth part of the refectory with the lease, fixtures, stock, furniture, &c., receiving therefor $2000. From that time till December 10th, 1842, he conducted the refectory for the account of himself and Burrell, being allowed one-eighth of the profits for defraying expenses, including the rent, which he agreed to pay; and Burrell received one-eighth of the profits, as the income on his investment. On the 10th of September, 1842, Pine mortgaged an undivided half of the premises, with the fixtures, &c., to McKean to secure $1900; and on the 1st of October ensuing, he gave a like mortgage of $2300 to Marcus Bull on his remaining one-fourth.

On the 9th of December, 1842, the rent being largely in arrear, and distress warrants therefor having been issued against Pine, which if carried to a sale, would break up the refectory, destroy the good will of the concern, and by divesting the fixtures, greatly depreciate their value; Bull and McKean called on Pine, and in the absence of Burrell and his agent, induced Pine to put them in full possession of the refectory, on their agreeing to pay the rent in arrear, and subject to Burrell's right. Bull and McKean at once employed an agent to carry on the business, and

on the 10th of December, Burrell's agent assented to their acts; it being provided that he should continue to receive one-fourth of the net profits, and should refund to them one-fourth of the arrears of rent.

Instead of discharging the rent, Bull and McKean suffered the landlords to proceed to a sale on the distress warrant. All the stock, fixtures, &c., except the marble floor, were sold, and by previous arrangement between them, McKean bid off the property for his own and Bull's benefit. The latter paid $550, and McKean $300, to the officer making the sale. From that time they conducted the business, excluding Burrell from the same. They however offered to his agent, at or about the time of the sale, to allow him to participate, if he would pay his proportion by a day then fixed by them, which he did not comply with.

Pine's lease terminated May 1, 1843, in anticipation of which, it was agreed between Bull, McKean and Burrell's agent, before the sale on the distress, that they should obtain a renewal of the lease for their joint benefit proportionate to their respective interests, and that Bull should negotiate therefor with Mr. Irving's executors. Bull negotiated accordingly, and obtained the executor's assent to terms by which the rent in the new lease would be $1000 a year less than in the current lease, and a reduction was to be made for the unexpired term of the latter. But on the excuse that he would not make himself responsible for the whole rent, (which was not communicated either to McKean or Burrell,) Bull made the arrangement for the renewal in his own name, and obtained from Irving's executors, a minute of its terms, on which he acted in his subsequent sale, claiming the whole interest in the new term.

On the 23d of March, 1843, Bull sold all his interest in the lease, refectory, &c., together with the right to the renewal of the lease, to Burke for about $2400, and on the 28th of March, McKean sold to Burke his interest in the refectory, &c., and all appertaining, for about $2700. On the following day, Bull and McKean put Burke into the possession of the entire property, who continued therein until long after the old lease expired, and who obtained a renewal of the same under the agreement made by

Bull with the landlords.  Burke had notice of Burrell's rights and claims before paying the purchase money.

Pine was discharged under the bankrupt law.

The bill claimed an account of the property and of the rents and profits from Burke, Bull and McKean, and payment of the value of Burrell's one-fourth of the refectory and its fitments, the good will of the concern, and the interest in the lease and renewal.

The answers of Bull and McKean denied the agreement to pay the arrears of rent, insisted that Burrell's interest was terminated by the sale under the distress warrants; and Bull alleged that there never was any valid or binding agreement for the renewal of the lease.

*T. Hastings* and *Edward Sandford*, for the complainant.

*A. P. Man*, for the defendant, Bull.

*R. Lockwood*, for H. S. McKean.

*M. K. Burke*, in person.

*B. W. Bonney*, for Waddell, the general assignee.

Messrs. *Hastings* and *Sandford*, for the complainants :

I. The testimony of J. H. Stewart, the husband of the complainant, L. M. Stewart, in the peculiar circumstances of this case, is competent for the purposes for which it was produced.

It can only be objected to on one or more of the following grounds : 1. Identity of interest between husband and wife; 2. A supposed conjugal bias; and 3. On the ground of public policy.

1. In this case there is no identity of interest whatever.  The husband has no pretence of interest.  The legal presumption of interest arising from the marriage, is fully rebutted by the marriage settlement and the testimony.

2. The objection on the ground of a supposed conjugal bias, goes to the credibility, and not to the competency.

3. The question of public policy, as a reason for the rule of exclusion, is far more intricate.

(*a*) In some of the earlier English cases, the rule of exclusion is laid down very broadly, that neither a husband or wife can testify either for or against each other. (1 Phil. Ev. 81, 82; 4 Term Rep. 678.)

(*b*) Yet the rule of exclusion even in England, has been most essentially modified.

In a collateral suit between third parties, husband and wife may be called to contradict each other. (1 Phil. Ev. 79, 80.)

So the wife may testify against the husband, for an act of violence to her person.

On trial of the husband for a forcible marriage, the wife was admitted to prove a voluntary elopement. (McNally's Ev. 181; 2 Hawk. P. C. 46, § 76.)

In our own courts, see 1 Hill, 63; 2 Hill, 181.

(*c*) The rule deduced from the English cases is undoubtedly as laid down by Starkie. (2 Starkie's Ev. 399.)

"The husband and wife cannot be witnesses *for each other*, for their interests are identical; *nor against each other*, on the grounds of public policy, for fear of creating distrust and sowing dissensions between them, and occasioning perjury." (References to 2 Hawk. P. C. 46; 2 Hale, 279; 2 Str. 1095; Co. Litt. 6, 112, 187; 2 Vern. 79; Greenleaf's Buller, 286. See also 11 Mass. 288.)

By the rule thus laid down—which is the only rational one—Stewart's interest being destroyed, he is admissible *for his wife*. He is not called *against her*.

(*d*) The rule is still further relaxed by American authorities:

"Though the rule of exclusion may still exist to some purposes here, it ought very readily be made to yield to those cases which are exceptions to its application." (10 J. R. 37, 44.)

In the case of *Barry* v. *Mercein*, Chancellor Walworth says: "Whenever, therefore, the policy or necessity of admitting her, (the wife,) as a witness against the husband is sufficiently strong to overbalance the principles of public policy upon which the general rule of exclusion is based, she ought to be received as a witness, if she has no interest adverse to his." The Chancellor

cites *Monroe* v. *Twistleton*, Norris's Peake App. 24 ; Swin. Just. Rep. 291 ; Syme's Just. Rep. 152.

The case of *Fenner* v. *Lewis*, (10 J. R. 37, 44,) already cited, treats the rule as one that must yield to circumstances. See also 11 Mass. 288.

In the case of *Richardson* v. *Learned et al.* (10 Pickering's Rep. 260, 269,) which was the case of an attachment suit by the wife and her trustee against their agent, the husband was sworn as a witness *for the wife.* Putnam, Justice, says : " The testimony of the husband was properly received. The recovery will not alter or affect his legal rights. It is altogether contingent whether the wife will make any appointment in his favor after the money shall have been recovered by the plaintiff, and without such new appointment the husband cannot touch the property."

(*e*) Stewart was the agent of the trust estate, and his testimony was therefore admissible on that ground. (1 Cowen & Hill, p. 96 to 98; 1 Hayw. 372, *Curtis* v. *Ingham*; 2 Vernon Rep. 289 ; Addison's Rep. 316, 319; 10 J. R. 37, 44 ; Strange, 527.)

II. The testimony of William Pine, objected to on the ground of interest, is competent; because,

1. He can derive no benefit from this suit whatever. Admitting that he has a claim against the defendants, Bull and McKean, it cannot in any way be drawn in question in this case.

2. His interest, if he has any, is at least equally balanced. He made an absolute sale to Burrell, and his interest now lies in qualifying that sale, so as to leave as much as possible in the hands of Bull and McKean, who are alone responsible to him. He is in fact called against his interest. If he sustains any loss, it is by Bull and McKean, the mortgagees in possession, and not by complainant.

3. A decree in bankruptcy has passed against him, and all his interest is absolutely vested in the defendant Waddell, his assignee, who is a party to this suit.

4. Neither Pine, nor his assignee, can make any claim either *under* or *against* the complainants. If either of them has any claim it is of course subject to the right of the complainants to

compensation for their one-fourth, and consists only in the right of redemption for the other three-fourths held by McKean and Bull.

III. The testimony of Burke, objected to on the ground of interest, is clearly competent.

1. He bought of Bull and McKean, and is therefore interested in maintaining their title adverse to complainants. He is called by complainants against his interest.

2. No decree can in this cause be made to promote his interest. If he should be made liable to complainants as the holder of the property with notice; still he bought the title of Bull and Mc-Kean, and he has his remedy over against them. But his testimony cannot form the basis of a decree for his benefit.

IV. When Bull and McKean made their respective loans to Pine, they knew that the complainants were the absolute owners of an undivided fourth of the lease for years then unexpired, and also of the fixtures and personal property on the premises; and that Pine, the owner of the other three-fourths, had covenanted in consideration of retaining one-eighth of the profits—that is half of complainant's legitimate profits—to pay the whole of the accruing rent; which was a covenant running with the lease if not with the personalty, so far at least as parties and privies are concerned; and when they came into possession of the other three-fourths, as mortgagees in possession, they held subject to Pine's covenant to pay rent, &c., as they derived the advantage of the covenant, a release of one-eighth of the profits, and by suffering the complainant's title to be defeated by their negligence, while in possession, they are at least liable in equity for the amount received by them on their sale to Burke, especially as that amount was procured by taking advantage of their own wrong.

1. Suppose this property, prior to defendant's mortgages, had been seized and sold under a landlord's warrant, would not the complainants have been fully paid out of the surplus, before Pine could have received any thing?

2. As Bull and McKean took possession of their three-fourths under an express agreement with Pine, to protect complainant's interests, as testified to by Pine, they ought not to be permitted

to gain an advantage which he could not have gained. The yielding of possession to them by Pine, was a good consideration for their agreement to him, especially as connected with the advantage of the enjoyment of one-half of complainant's profits as released by their covenant. Else it would work a gross fraud upon him, and upon the complainants.

V. If the defendants, Bull and McKean, are to be regarded as absolute purchasers of their three-fourths; then, as they took under a full notice of complainant's rights under the covenant with Pine, without affording complainants any opportunity to object, either as to the making of the mortgages, or as to the surrender of the possession, they were equitably bound, even in the absence of the agreement, to provide for the accruing rent out of the fund provided by Pine for that purpose, to wit: one-eighth of the profits relinquished to him by the complainants, and his three-fourths. The defendants having by their neglect suffered the personalty to be sold in bad faith, and procured and disposed of the new lease for their exclusive advantage, they are equitably chargeable with the whole amount of the complainant's claim and reasonable interest, or profits.

VI. By their agreement at and about the time of the surrender, taking possession, as they did, under full notice of complainant's equities, the defendants, Bull and McKean, placed themselves in a relation to the complainants of a strictly fiduciary character. They will not, therefore, be permitted to advantage themselves by a breach of faith, and must account for at least that advantage, as well as for the consequences of their violated faith, even if the agreement itself should be deemed to be void under the statute of frauds. They have derived an advantage by violating a trust reposed in them by complainants, and if necessary to the ends of justice, they may be charged as trustees.

VII. But the agreement of Bull to pay rent, to reduce rent, and to procure a new lease for the joint benefit of himself, McKean, and the complainants, connected as it was with their several interests in the subject matter, and with the release to him by McKean of one-eighth of the entire three-fourths as a consideration therefor, was a legal and binding agreement upon

Bull without being reduced to writing. He at any rate must account.

VIII. By the agreement of the 9th and 10th of December, 1842, the defendants, Bull and McKean, and the complainants became partners, and the new lease, as well as the property purchased at the landlord's sale, enured to the benefit of all; and the defendants having disposed of the whole for their own benefit, must now account with complainants for the property and for the profits which might have accrued, but for their mismanagement. (Story on Part. 619, 629, and notes; *Pickering* v. *Bolles*, 1 Bro. C. C. 197; 17 Vesey, 298, 305, 311; 1 Ball & B. 29, 46, 47; 1 ibid. 409, 417, *Mulvany* v. *Dillon*.)

IX. The defendant Burke, having purchased the property with his eyes open, and after full notice, got no title, as against the complainants; and he must therefore account.

Mr. *Man*, for the defendant Bull, made the following points:

I. Stewart is incompetent as a witness for the complainant. (2 Kent's Com. 178, 179, note *d*.; Gresley's Eq. Ev. 246; 5 Russell, 19; 2 Fonbl. Eq. 457, note; 1 Bl. Com. 443; 1 Burrow's R. 443; 2 Stark. Ev. 400, 708; 7 J. J. Marsh. 263; 6 Binney, 483; 1 Phill. Ev. 76, 82; 8 Paige, 49, 50; 2 Cow. & Hill's Notes, 1556; 7 Johns. Ch. R. 229, 245, 247; 1 Ry. & M. 352; 4 T. R. 678.)

II. Pine and Burke are also incompetent as witnesses for the complainants. (5 Paige, 638; 1 Barb. Ch. Pr. 259.)

III. The complainants cannot have a decree against Bull, because by examining Burke, who, or whose property, is primarily liable, they have discharged both him and Bull so far as the present suit is concerned. (*Bradley* v. *Root*, 5 Paige, 632, 636, 637; *Thompson* v. *Harrison*, 1 Cox, 344; 1 Barb. Ch. Pr. 258, and cases there cited; *Bernall* v. *Donegal*, 3 Dow's P. C. 133, 150; *Meadbury* v. *Isdall*, 9 Mod. 438; Ambler, 878.)

Burke and his property being discharged, no decree can be made in this suit, which will not be inconsistent with the case made by the bill. (*Colton* v. *Ross*, 2 Paige, 396; Story's Eq. Pleadings, § 42; 1 Barb. Ch. Pr. 37; Mitford's Pleadings, 38 and 39, and cases there cited; 2 Peter's R. 595, 612.)

IV. The landlord's sale divested Stewart's, (or Burrell's) rights in the fixtures, furniture, &c., and vested the title in McKean, and through him in Bull. Complainants are bound by Stewart's acts and defaults.

V. The statute of frauds is an entire bar, so far as the claim to the present lease is concerned. The pretended agreement for procuring and sharing in a lease was void by the statute; and the pretended agreement between Bull and Irving for a lease was also void by the same statute. (2 R. S. 134, § 8, and compare sections 6 and 7; 1 R. L. p. 78, §§ 9 to 14; Notes of Revisers, 3 R. S. 655; Story's Eq. Jur. § 563, 566, note, 768; 2 Paige, 181; 4 ibid. 197; 2 P. Will. 620; 2 Atkyns, 150; 1 Fonbl. Eq. B. 1, ch. 3, § 8.)

VI. The doctrine of resulting trusts, or trusts raised by operation of law, does not apply to the present case. (1 Hilliard's Abridg. p. 214, §§ 31 and 32, and cases, viz: 1 Vernon, 276; 5 J. C. R. 388; 2 ibid. 409; 2 Atkyns, 71; 4 Bibb, 102; 2 Story's Eq. § 768.)

Mr. *Lockwood*, for McKean, urged substantially, the same grounds; and cited in addition, *German v. Machin*, 6 Paige, 288, and 1 Barb. Pr. 258.

THE ASSISTANT VICE-CHANCELLOR.—The defendants move to suppress the deposition of Mr. Stewart, who was sworn as a witness for his wife. He has no interest in the event of the suit, and the objection of bias does not go to his competency.

But on the ground of public policy, I think he was an incompetent witness.

The complainants relied upon the case of *Richardson v. Learned*, (10 Pick. 261,) where the Supreme Court of Massachusetts held the husband to be a competent witness for the trustee of the wife in an action for a part of her separate estate. The conclusion was deduced from the fact that the husband had no interest in the event of the suit, without adverting to the effect of the principle upon the married relation. On the other hand, in *Snyder's Lessee v. Snyder*, (6 Binney, 483,) the Supreme Court of Pennsylvania came to an opposite conclusion,

reposing their opinion upon what appears to be the true ground, public policy.

In *Hopkins* v. *Smith*, (7 J. J. Marsh. 263,) the Court of Appeals in Kentucky decided that the husband, although not interested, could not be a witness for the wife's trustee in an action of trover for a part of her property.

In England, the only case admitting such testimony, is *Burridge* v. *Winter*, (1 C. & P. 364,) at Nisi Prius, before Abbott, Ch. J. That case was contrary to *Monroe* v. *Twistleton*, (Peake's Ev. by Norris, 248, and Appendix, 29,) previously decided by Lord Alvanley, and to *Doker* v. *Hasler*, (R. & M. 198,) decided by Best, Ch. J., the same year that *Burridge* v. *Winter* was tried. And the latter case was expressly overruled in *O'Connor* v. *Majoribanks*, in the C. P., Trin. T. 1842, and the rule established, on consideration, that husband and wife should not be witnesses either for or against each other in civil cases; and that without regard to the circumstance whether the fact came to them confidentially or otherwise, neither could be permitted, even after the marriage terminated, to testify concerning what transpired between them during the marriage, or came to their knowledge by reason of the relation of husband and wife; (6 Lond. Jur. Rep. 509; 5 Scott's New Rep. 394.) This accords with the Chancellor's view of the true reason of the exclusion, as stated in *The People, ex rel. Barry* v. *Mercein*, (8 Paige's R. 50,) and which I feel bound to adopt. The Supreme Court go upon the ground of confidential communications in *Ratcliff* v. *Wales*, (1 Hill, 63,) and *Babcock* v. *Booth*, (2 ibid. 181.) The authorities are decidedly against the competency of the witness, and his deposition must be suppressed. And see farther on this point, Greenleaf's Ev. 384, *et succ.*, § 334, &c.(*a*)

The testimony of William Pine is objected to on the ground

---

(*a*) In *Langley* v. *Fisher*, the Chancellor of England, April 10, 1845, held, affirming the decision of the Master of the Rolls, that a husband could not be compelled to testify against his wife in a suit affecting her separate estate. Reported before the Chancellor in 9 Lond. Jur. Rep. 837, and 14 Law Journal, N. S. Chy. 102 ; before the M. R., 7 Lond. Jur. Rep. 164, and 15 Law Journal, Chy. 73.

of interest. It is said he was liable to pay the rent as between himself and Burrell, and a decree in favor of Burrell will satisfy that liability.

If that be the result, I think his interest is balanced. There is nothing to prevent Bull and McKean from suing him upon their respective mortgage debts, for whatever sum they were compelled to pay by reason of the fourth of the rent in arrear when they took possession. The amount applicable to the reduction of their mortgage debts, is diminished by the amount of such rent then chargeable on the property surrendered; and although their mortgages were upon three-fourths only of the stock and fixtures, yet their rights and interests as occupants of the premises, were affected by the entire rent in arrear. The answers show that when they contemplated paying the arrears, it was the whole, and not three-fourth parts, that they designed to pay. Thus it seems that Pine was liable to the defendants, (and so remained when he testified,) and if the result of this suit should cause them to pay the one-fourth of the rent which was in arrear on Burrell's one-fourth of the lease, it will not exonerate Pine from answering over to them in respect of the thereby increased deficiency upon his mortgage debt.

There is another ground which is decisive of this question. The allegations in the bill would be a complete defence to Pine in any action brought by Burrell for his omission to pay the rent. The bill shows that Burrell ratified and adopted Pine's surrender to the defendants, and accepted their engagement to pay the rent. This was a satisfaction of Pine's liability in that respect.

The defendant Bull moved to suppress the re-examination of W. Pine on the 25th of October, 1844; because his examination had been closed, and was then resumed upon the same matters. The first objection taken before the examiner fails because the ground of the objection was not stated. When the objection is taken at folio 240, the ground is stated, and the question and answer on that folio must be suppressed.

There is also a motion to suppress the testimony of Burke, because he is a party defendant, and it is said is primarily liable for the claim made by the bill. As to the former objection, the fact does not appear on this motion that a replication was filed

to his answer. Hence his being a party, is not of itself a ground for excluding his testimony. As to his interest, he was not liable at all to the complainant in equity, unless he bought with notice of the rights stated in the bill. If he did buy with such notice, he became a participant in the fraud which the bill charges upon Bull and McKean. For such fraudulent conduct, the complainant could recover against the latter alone, or against them and Burke also. If he chose to omit Burke, and should recover against the others, there would be no contribution due from Burke to them. And a recovery against them, without satisfaction, would not prevent a recourse to him. Thus Burke has no interest which makes him incompetent. He may have a bias, strong in proportion to the probability of the complainants proving notice against him, conjoined with the prospect of their obtaining full satisfaction upon a decree against Bull and McKean.

The point that Burke was primarily liable, was urged against any decree being made at all, as well as against the competency of his testimony.

The only liability of his which can be so considered, is for an account of the profits subsequent to the time when he took possession of the refectory. This account is doubtless waived by the complainants using him as a witness.

In respect of the account claimed after the sale on the landlord's warrant and before Burke took possession, he has no interest whatever. And in respect of the claim for an account of the sale of the stock, fixtures, possession and lease to Burke; the parties who made the sale and received the proceeds of it are primarily accountable on the case made by the bill. It would be very hard if Burke should be held accountable before those who obtained his money by the alleged fraud upon the complainants.

Upon the merits of this case, I have had no difficulty, notwithstanding the elaborate and ingenious argument of the counsel for Bull.

The testimony establishes that Bull and McKean, for the consideration of obtaining the immediate possession of the refectory, agreed to pay the rent then in arrear. Whether one-fourth of it

was to be refunded by Burrell, is not material to this part of the inquiry, and I will omit it for the present.

The motives for the agreement were obvious and pressing. The refectory in operation was then deemed a valuable property. The stock, fixtures, &c., separated from the refectory, the lease and the good will, were worth far less than their mortgages. Those mortgages entitled them to take the stock and fixtures, but they could not have obtained possession of the leasehold, without Pine's consent, till about the end of the current lease. Thus a divesting and sale of the movables, whether by the distress warrants, or on their own mortgages, would have broken up the refectory, and resulted in the certain loss of a large portion of their debts. Pine was in the exclusive possession, but he possessed one-fourth of it for Burrell, its absolute owner.

In the absence of Burrell and his agent, being pressed by Bull and McKean to put them in possession, he made the agreement, by which he in effect relinquished to them his equity of redemption in the three-fourths of the lease, and delivered up to them the entire possession and the good will of the refectory; and by which they agreed to pay the rent and to protect Burrell's interests. That the delivery of possession on the evening of the 9th of December, was entire and complete, is shown by the fact that Pine never after had any charge there; and Bull and McKean placed Thompson in charge, who proceeded before Stewart returned, as having charge not of three undivided fourths, but of the whole establishment.

Stewart's resuming possession of the one-fourth, the ensuing day on his return, by proceeding to the premises, asserting Burrell's right, and assenting to Thompson's agency; did not alter or change the terms on which the parties had been let into possession. By those terms they were bound to respect Burrell's interest, precisely as they and Thompson were, after Stewart's assent to what had been done.

The statute of frauds has no application to this agreement. Instead of its performance of necessity being postponed more than a year, it was necessarily to be performed immediately.

Both the answers, although they deny the agreement, show that Bull at least intended to pay the rent. And looking at the

fact that Mr. Irving issued the distress warrants in consequence of information from Bull ; the agreement to pay the rent, thereby acquiring possession, and the subsequent omission to pay it ; there is certainly good reason to suspect Bull of a design to defraud both Pine and the complainants.

But it is unnecessary for the complainants to show any fraudulent intent. It suffices that there was a valid agreement made for their benefit on which they had a right to rely ; by the violation of which the defendants became nominally the exclusive owners of the whole establishment except the lease of the building ; and upon the strength of such ownership they excluded the complainants from the whole, including the lease. They did not pay the rent ; the necessary consequence was a sale under the distress warrants, and they became the purchasers, and continued the business.

Now, it makes no difference whether Burrell, by their subsequent understanding with Stewart on the 10th of December, was to bear a fourth of the arrears or not. They were to pay the arrears in the first instance. Until they paid the rent, they had no claim on Burrell for the fourth part, if there were such an agreement. And as they did not pay the arrears, Burrell was never in default for not refunding. Much was said of the inadequacy of the value of the stock, fixtures, &c., to constitute any inducement to Bull and McKean for the alleged agreement to pay the rent. I cannot discover any inadequacy. Pine estimated the establishment as worth $10,000. In March following McKean sold his share to Burke for $2500, and Bull obtained for his, including the good will of the new lease, $2350.

The sale having resulted from Bull and McKean's violation of their engagement and of their duty to Burrell, it did not alter or affect the rights of Burrell as between him and them. He continued in equity the owner of the fourth part of the stock, fixtures, &c., until the sale of the same to Burke. (So far as Burke is concerned, Burrell ratifies that sale by waiving a decree against him.)

The complainants are therefore entitled to an account of the profits of the concern from the 19th of December, 1842, until Burke took possession, and to a decree for such profits, and for

one-fourth of the sums obtained from Burke on the sale to him in respect of the stock, fixtures, furniture, &c., and the possession of the premises. Although Bull did not convey the complainant's fourth of the subsisting lease by name, yet he did convey the possession expressly, and he and McKean gave possession of the whole to Burke. The lease was then within five weeks of its determination ; and the defendants in effect assumed to clothe Burke with the whole right to the premises. They should therefore account for the price obtained, as if they had actually transferred the entire lease.

The complainants having used the testimony of Burke, I think it establishes against them the position that their agent, Stewart, agreed to refund to Bull and McKean one-fourth of the arrears of rent which they were to pay on taking possession. ·

The accounting will accordingly provide for this, and it must proceed upon the basis of the reduced rent paid to the landlords during the closing period of the lease.

The remaining question in the cause relates to the renewal of the lease, at a reduced rent, for which Bull contracted with the landlords. It is proved that while Burrell had an acknowledged interest in the current lease with Bull and McKean, it was arranged that Bull should obtain a new lease for their common benefit, on the best terms he could. The other parties intrusted the whole negotiation to him. Bull accordingly negotiated for the renewal, his interest in the premises being known to the landlords, and obtained the promise of the same at a yearly rent $1000 less than that in the old lease. And after having the terms of renewal settled in writing, not so as to be legally binding on the landlords, but so as to be certain of their accomplishment; he refused to recognize Burrell's right to participate in it, and finally appropriated its benefit to himself, excluding McKean also. I agree with his counsel that no resulting trust arose from this transaction ; but I cannot perceive that the statute of frauds has any application, although the whole arrangement was by parol.

It was a transaction by which one of three joint owners of a lease, deputed by his associates to obtain its renewal for the common benefit, and availing himself of his part ownership and his

connection with the property to obtain such renewal; procured it in his own name, and attempted to shut out his associates from sharing in its advantages. It is in short, an unmitigated fraud, against which courts of equity have ample jurisdiction to grant relief.

Without citing the authorities at large, I refer to *James* v. *Dean*, (11 Ves. 383, and 15 ibid. 236;) *Featherstonhaugh* v. *Fenwick*, (17 ibid. 298;) *Pickering* v. *Vowles*, (1 Bro. C. C. 197;) *Mulvany* v. *Dillon*, (1 B. & Beatt. 409.)(a)

The defendant Bull must account for the sum received by him, precisely as if the renewed lease had been engaged to Burrell, McKean, and himself, according to their respective interests in the outstanding term.

There must be a decree accordingly, reserving the question of costs and all further directions.

---

(a) See also *Gibbes* v. *Gibson*, reported *postea*; and 5 Paige, 268.